PER CURIAM.
 

 Marshall Lee Gore, a prisoner under sentence of death, appeals the circuit court’s order denying his motion for post-conviction DNA testing, which was filed pursuant to Florida Rule of Criminal Procedure 3.853. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution.
 

 FACTS
 

 The facts of the case are set forth in this Court’s 1992 opinion affirming Gore’s convictions and sentence:
 

 Susan Roark was last seen alive on January 30, 1988, in Cleveland, Tennessee, in the company of Marshall Lee Gore. Gore had planned to travel to Florida with a friend from Cleveland. While waiting for his friend at a convenience store, Gore struck up a conversation with Roark. Gore then entered Roark’s car, a black Mustang, and they drove away.
 

 Gore accompanied Roark to a party at the home of a friend of hers. Roark had planned to spend the night at her friend’s home. Sometime between 11:30 and 12:00, Roark left to drive Gore home. She never returned. . The following day Roark’s grandmother reported her missing. She had been expected home by 7 a.m. that morning.
 

 Gore arrived in Tampa on January 31, driving a black Mustang. He convinced a friend to help him pawn several items
 
 *616
 
 of jewelry later identified as belonging to Roark. Gore then proceeded to Miami, where police subsequently recovered Roark’s Mustang after it was abandoned in a two-car accident. Gore’s fingerprint was found in the car, as well as a traffic ticket which had been issued to him while he was in Miami.
 

 On April 2, 1988, the skeletonized remains of Roark’s body were discovered in Columbia County, Florida. The naked body was found in a wooded area which had been used as an unauthorized dumping ground for household garbage and refuse. Expert testimony established that the body was placed in its location either at the time of death or within two hours of death. The body could have been there anywhere from two weeks to six months prior to discovery. The forensic pathologist who testified for the State concluded that the cause of death was a homicide, given the situation in which the body was found and the fact that the neck area of the body was completely missing. The pathologist explained that this was probably due to some injury to the neck, such as a stab wound or strangulation trauma, which provided a favorable environment for insects to begin the deterioration process.
 

 Gore v. State,
 
 599 So.2d 978, 980 (Fla. 1992). In Gore’s postconviction case, this Court summarized the following additional relevant facts:
 

 In addition to this evidence, the State introduced the testimony of two other witnesses. Specifically, Lisa Ingram testified that she “was riding in a car with Gore on February 19 when she saw a woman’s purse in the back seat. She testified that Gore stated that the purse belonged to ‘a girl that he had killed last night.’ ”
 
 [Gore,
 
 599 So.2d] at 983. We concluded on appeal that “this testimony was admissible as an admission with regard to the Roark homicide.”
 
 Id.
 
 Further, the State presented the collateral crime testimony of another victim, Tina Corolis:
 

 The testimony of Tina Corolis was admitted as evidence of a collateral crime. Corolis was a casual acquaintance of Gore’s, whom she knew as “Tony.” In March of 1988, Gore called Corolis at her home and told her that his car had broken down and he needed a ride to it. After they had driven around for several hours, Gore revealed a knife, gained control of the car, and drove to a partially wooded dumping area off a dirt road. He put the knife to Corolis’ stomach, forced her to undress, and raped her. He then dragged her out of the car, punched her face against a rock, strangled her, and stabbed her in the neck, arms, legs, and buttocks. Shortly thereafter Gore pawned several items of Corolis’ jewelry and then proceeded to Kentucky in her car.
 

 Id.
 
 We concluded on direct appeal that the “cumulative effect of the numerous similarities between the two crimes is the establishment of a unique modus operandi which points to Gore as the perpetrator of the Roark homicide.”
 
 Id.
 
 at 984. The jury found Gore guilty of first-degree murder, kidnapping, and robbery.
 
 See id.
 
 at 980.
 

 The jury recommended a sentence of death by a vote of eleven to one, and the trial court followed this recommendation after finding the following aggravating circumstances: (1) Gore had previously been convicted of other violent felonies; (2) the murder was committed while Gore was engaged in a kidnapping; (8) the murder was committed for financial gain; and (4) the murder was cold, calculated, and premeditated.
 
 See id,,
 
 at 986. The judge concluded that Gore’s
 
 *617
 
 poor childhood and antisocial personality were insufficient mitigation to outweigh the aggravating circumstances.
 
 See id.
 

 Gore v. State,
 
 846 So.2d 461, 464-65 (Fla. 2003). This Court affirmed Gore’s conviction and sentence on direct appeal.
 
 Gore v. State,
 
 599 So.2d 978 (Fla.1992). The Court also affirmed the trial court’s order denying Gore’s motion for postconviction relief as well as Gore’s habeas corpus petition filed with this Court.
 
 Gore v. State,
 
 846 So.2d 461 (Fla.2003).
 

 Gore subsequently filed a
 
 pro se
 
 motion entitled “Innocent Defendant’s Motion for Postconviction DNA Testing Pursuant to F.R.C.P. Rule 3.853.” In his motion, Gore sought DNA testing of a variety of items collected in connection with the murder investigation. Additionally, Gore appeared to request DNA analysis of a pair of bloody pants collected from the investigation of another case in which Gore was convicted of murder — the Novick case.
 
 [1]
 
 Gore also sought to have DNA samples collected from Tina Corolis and David Res-trepo.
 
 [2]
 

 The trial court summarily denied Gore’s motion as facially insufficient, finding as follows:
 

 The Defendant seeks to have DNA tests run on evidence that was collected near the victim. It should be noted that the victim was buried under a layer of leaves at an unauthorized trash dump in a rural part of Columbia County. The Defendant alleges, that because there is no physical evidence that ties him to the victim, crime scene, or county, DNA tests run on the evidence cited will reveal that he is innocent.
 

 The Defendant is incorrect in this assertion. The identity of the perpetrator of this crime is, was, and can be established without any direct physical evidence. Some of the means of identifying the Defendant are: the Defendant was the last person seen with the victim, the Defendant was in possession of the victims [sic] car (in which he was the last person seen with the victim), and the Defendant pawned personal items of the victims.
 

 Thus, the statutory requirement of a question of identity has not been met, and the Rule 3.853 motion is facially insufficient.
 

 State v. Gore,
 
 No. 88-607-CF at 1 (Fla.3d Cir. order dated July 11, 2006). Gore now asserts that the trial court erred in denying his motion on the grounds that it was facially invalid. As explained below, we affirm the trial court’s denial of Gore’s motion for postconviction DNA testing.
 

 ANALYSIS
 

 Gore’s Request to Conduct DNA Testing on Items Collected During the Investigation of This Case
 

 Gore seeks to have DNA testing conducted on items collected during the investigation of this case, asserting that the items were collected from either the vicinity of the victim’s body or from the victim’s vehicle, and contends that the trial
 
 *618
 
 court erred in denying his motion as facially insufficient.
 

 The clear requirement of the provisions of section 3.853 is that
 

 a movant, in pleading the requirements of rule 3.853, must lay out with specificity how the DNA testing of each item requested to be tested would give rise to a reasonable probability of acquittal or a lesser sentence. In order for the trial court to make the required findings, the movant must demonstrate the nexus between the potential results of DNA testing on each piece of evidence and the issues in the case.
 

 Hitchcock v. State,
 
 866 So.2d 23, 27 (Fla. 2004). This Court has previously explained that “[i]t is the defendant’s burden to explain, with reference to specific facts about the crime and the items requested to be tested,
 
 how
 
 the DNA testing will exonerate the defendant of the crime or will mitigate the defendant’s sentence.”
 
 Lott v. State,
 
 931 So.2d 807, 820 (Fla.2006) (emphasis added) (quoting
 
 Robinson v. State,
 
 865 So.2d 1259, 1265 (Fla.2004)). “The burden is on the movant to ‘demonstrate the nexus between the potential results of DNA testing on each piece of evidence and the issues in the case.’ ”
 
 Van Poyck v. State,
 
 908 So.2d 326, 329 (Fla.2005) (quoting
 
 Hitchcock,
 
 866 So.2d at 27). This Court has rejected claims where the defendant was “merely speculating” and has “repeatedly cautioned that ‘[r]ule 3.853 is not intended to be a fishing expedition.’ ”
 
 Lott,
 
 931 So.2d at 820-21 (quoting
 
 Cole v. State,
 
 895 So.2d 398, 403 (Fla.2004)). Gore has not met his burden and, accordingly, we affirm the trial court’s denial of DNA testing on the items collected during the investigation of this case.
 

 Gore seeks DNA testing of the following items: (1) earrings found near the victim; (2) a shoe string found on the victim’s wrists; (3) socks; (4) a pink shirt; (5) white bikini panties; (6) a panty shield found in two pieces; (7) an earring taken from the victim’s vehicle; (8) a multicolored pillow taken from the victim’s vehicle; (9) a grey shirt found in a brown box; (10) multi-colored shorts found in a brown box; (11) a blood sample taken from the map light of the victim’s vehicle; (12) Fruit of the Loom underwear and one pair of socks; (13) a curling iron and hair brush belonging to the victim; (14) debris from the underwear and socks; (15) debris from the panties and panty shield; (16) contact lenses found near the body of the victim; (17) an empty Marlboro brand cigarette package; (18) three empty beer bottles; (19) fingernails collected near the victim’s body; and (20) strands of hair found in the victim’s right hand.
 

 Although Gore was specific as to the list of the items that he requests be tested, a closer examination shows that DNA testing of the items would not exonerate him of the murder. Some of the items were found at the crime scene, but not in close proximity to the body, which was located in a wooded area used as an unauthorized dumping ground for household garbage and refuse. This area was near a road that, according to trial testimony, was strewn with household refuse from beginning to end. For example, Gore requests DNA testing on a Marlboro brand cigarette package, which was found approximately fifty yards from the body. He also requests DNA testing on “Fruit of the Loom underwear,” a pair of socks, and debris from the underwear and socks— these items were located near the entrance to the road, over one hundred yards away from the body.
 

 From a review of the trial record, other items that Gore requests be tested appear to have been located in closer proximity to the body. These items include earrings that were found underneath the victim’s
 
 *619
 
 head, socks, a pink shirt, panties, contact lenses, empty beer bottles, fingernails, a panty shield found in two pieces, and debris collected from the panties and panty shield. However, Gore has not earned his “burden to explain, with reference to specific facts about the crime and the items requested to be tested,
 
 how
 
 the DNA testing will exonerate the defendant of the crime or will mitigate the defendant’s sentence.”
 
 Lott,
 
 931 So.2d at 820 (emphasis added) (quoting
 
 Robinson,
 
 865 So.2d at 1265). Further, this area was used as an unauthorized dumping ground for household garbage and refuse and, because the body was not found until weeks or months after the murder, the chance of contamination is increased.
 

 Another category of items at the crime scene — strands of hair found in the victim’s right hand and a shoe string found knotted around the victim’s left wrist— could likely have been related to the murder but were never used to inculpate Gore and Gore has not shown how the DNA testing of these items could be used to exonerate him of the murder.
 

 Gore also seeks to have DNA testing performed on items found in the victim’s vehicle. These items are earrings, a multicolored pillow, a shirt, shorts, and a “blood sample” from the map light of the vehicle. The shirt had blood on the left sleeve that was consistent with Gore’s blood type and enzyme type — a type that was found in approximately sixteen percent of the population. The shorts and map light tested positive for presumptive presence of blood, but the analyst testifying at trial was not able to determine more than that.
 

 Finally, two of the items in Gore’s list are completely unconnected to the crime scene or the victim’s vehicle — a curling iron and hair brush belonging to the victim. These items were provided to the investigators in this case by Tennessee police to be used as a standard sample of the victim’s hair for comparison purposes.
 
 [3]
 
 It is not clear whether Gore is requesting DNA testing on these items in order to provide a comparison sample of the victim’s DNA or whether Gore believes that these items were located at the crime scene or in the victim’s vehicle.
 

 Gore asserts that because the State collected all of the above items at the time of the murder investigation, they must have some relevance to the murder. However, none of the items were ever used by the State to inculpate Gore, with the exception of the shirt found in the victim’s vehicle that had blood matching Gore’s blood type and enzyme type. Importantly, there is absolutely no indication that any of the items could be used to exonerate Gore. Gore asserts that the testing of the items will serve to establish that someone other than Gore committed the murder by either establishing the true identity of the actual killer or exclude Gore as the perpetrator of the murder. Even if the DNA analysis indicates a source other than the victim or Gore, “there is no reasonable probability that [he] would have been acquitted or received a life sentence,”
 
 Tompkins v. State,
 
 872 So.2d 230, 243 (Fla.2003), as the DNA very likely could have come from someone other than the murderer given the location of the items in either a trash dump or in the victim’s vehicle.
 
 See Lott,
 
 931 So.2d at 820-21.
 

 Gore asserted in his motion filed with the trial court that DNA testing will allow the Florida Department of Law Enforcement to “compare those profiles to the
 
 *620
 
 profiles of known perverts.” This is exactly the sort of speculation and fishing expedition for which rule 3.853 was not intended.
 
 See Lott,
 
 931 So.2d at 820-21.
 

 Further, the absence of Gore’s DNA on the listed items collected from the crime scene or the victim’s vehicle would not exonerate him or mitigate his sentence because “such results would not prove that [he] was neither the perpetrator nor present at the crime scene.”
 
 Overton v. State,
 
 976 So.2d 536, 570 (Fla.2007). Moreover, the evidence presented at trial clearly connected Gore to the murder. He was the person last seen with the victim by any credible witness testifying at trial.
 
 Gore,
 
 599 So.2d at 980, 984. Within twenty-four hours of the victim’s disappearance, Gore was seen in Florida in possession of her vehicle.
 
 See id.
 
 He received a traffic ticket while driving the victim’s vehicle in Florida, and his fingerprints were found in the victim’s vehicle, which was abandoned after an accident.
 
 Id.
 
 He also had someone pawn the victim’s jewelry.
 
 Id.
 
 Finally, he admitted to Lisa Ingram that a purse in the victim’s vehicle belonged to a girl he had killed “last night or a few nights ago.”
 
 Id.
 
 at 983.
 

 In sum, Gore has not carried his burden to “explain, with reference to specific facts about the crime and the items requested to be tested, how the DNA testing will exonerate” him or mitigate his sentence in this case.
 
 See Lott,
 
 931 So.2d at 820 (quoting
 
 Robinson,
 
 865 So.2d at 1265). Under the facts of this case, we conclude that he cannot carry this burden with respect to these items.
 

 Gore’s Request to DNA Test an Item Collected During the Novick Case Investigation and to Have DNA Samples Collected from Restrepo and Corolis
 

 Gore also claims that he is entitled to have an item from another crime scene investigation tested for DNA and that he is entitled to have the court order DNA samples to be collected from Restrepo and Corolis so that he may collaterally attack Corolis’s testimony in the instant case. Specifically, he contends that Corolis’s DNA will be found on a pair of bloody pants taken from the Novick vehicle during the investigation of the Novick murder case.
 
 [4]
 
 Since Corolis testified in the instant case that she had met Gore only briefly prior to him assaulting her and that she did not know Novick, Gore asserts that the presence of her DNA on the pants would demonstrate that her testimony in this regard was false. As to Restrepo, Gore has not made an argument for how obtaining Restrepo’s DNA would allow Gore to attack his conviction in the instant case.
 
 [5]
 

 Gore claims that the collection of this DNA evidence would allow him to “attack” his conviction in all three eases by undermining Corolis’s testimony. Without deciding whether Gore would even be entitled to testing of these items under the rule, we conclude that he cannot demonstrate how the DNA testing he requests would exonerate him in this case or mitigate his sentence in this case.
 

 CONCLUSION
 

 For all of these reasons, we affirm the circuit court’s order denying Gore’s rule 3.853 motion for DNA testing.
 

 It is so ordered.
 

 
 *621
 
 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . In a separate case, Gore was also convicted of the March 1988 first-degree murder and armed robbery of Robyn Novick in Dade County and sentenced to death. The convictions and death sentence were affirmed on appeal.
 
 See Gore v. State,
 
 784 So.2d 418 (Fla.2001). We also affirmed the denial of postconviction relief.
 
 Gore v. State,
 
 24 So.3d 1 (Fla.2009).
 

 [2]
 

 . David Restrepo was a witness in the Novick murder case. He testified that Gore arrived at his home, driving a Corvette (that was later determined to belong to Novick). While Res-trepo was riding in Novick's vehicle with Gore, Gore lost control of the vehicle, wrecked it, and abandoned it.
 
 Gore,
 
 784 So.2d at 423-24.
 

 [3]
 

 . The hair analyst who testified at trial asserted that she decided that the hairs were too damaged to be used as a hair standard for the victim. Accordingly, the analyst was not able to rule out the victim as the source of some of the hairs found at the scene.
 

 [4]
 

 . Gore does not assert that he is seeking access to DNA samples previously collected from Restrepo and Corolis in any of his three cases. Rather, he seeks to have the court order the collection of DNA samples from these two individuals.
 

 [5]
 

 . In fact, since Restrepo was in Novick’s vehicle with Gore and they were both injured during the crash, one could expect to find his blood on an item recovered from the vehicle after the crash.